**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**BROOKLYNN McELYEA** **PLAINTIFF**

**VS.** **No. 4:25-cv-01158 KGB/PSH**

**FRANK BISIGNANO, Commissioner,**
**Social Security Administration** **DEFENDANT**

## PROPOSED FINDINGS AND RECOMMENDATIONS

## INSTRUCTIONS

The following recommended disposition has been sent to Chief United States District Judge Kristine G. Baker. You may file written objections to all or part of this Recommendation. If you do so, those objections must: (1) specifically explain the factual and/or legal basis for your objection; and (2) be received by the Clerk of this Court within fourteen (14) days of this Recommendation. By not objecting, you may waive the right to appeal questions of fact.

## DISPOSITION

Plaintiff Brooklynn McElyea ("McElyea") appeals the final decision of the Commissioner of the Social Security Administration (defendant "Bisignano") to deny her claim for Supplemental Security Income ("SSI") and Disability Insurance

Benefits ("DIB"). McElyea contends the Administrative Law Judge ("ALJ") erred in two ways: (1) by failing to properly evaluate the opinion of Dr. Samuel B. Hester ("Hester"), a consultative psychologist; and (2) by reaching an erroneous residual functional capacity ("RFC") by failing to fully incorporate mental work-related interpersonal contact limitations assessed by the state agency psychologists and deemed persuasive by the ALJ.

Bisignano contends substantial evidence supports the ALJ's decision that McElyea was not disabled during the relevant period. This statement is correct, and it is recommended that the ALJ's decision be affirmed and the case dismissed for the reasons stated below.

The parties ably summarized the medical records and the testimony given at the telephonic administrative hearing, which was conducted on March 12, 2024. (Tr. 48-72). The ALJ's decision was issued on May 22, 2024. (Tr. 27-41). The Court has carefully reviewed the record to determine whether there is substantial evidence to support the Commissioner's decision. 42 U.S.C. § 405(g). The relevant period under consideration is from February 1, 2021, the alleged onset date, through May 22, 2024, the date of the ALJ's decision.

*The Administrative Hearing:*

Following an opening statement by her attorney, McElyea responded to questions posed by the ALJ, stating she was 30 years old, had the equivalent of a high school education, and had previously been certified as a CNA. She was 4'11" and weighed around 160 pounds. She possessed a driver's license and used it. McElyea described past relevant work as a CNA in 2019 and 2020. When asked about issues interfering with a return to the workplace McElyea said "I get overwhelmed quickly . . . it's hard for me to function in, like, fast paced situations . . . communication is very hard for me . . . sometimes I can't pinpoint why I get overwhelmed . . . I either escalate the situation or I shut down." (Tr. 55-56). McElyea stated she was not in mental health counseling at the time even though she knew she needed it.

As a single mom she sacrificed "something of my own care just so that I can take care of my kids." (Tr. 57). Her children were 12, 8, and 5 at the time. She and the children resided with her brother and sister-in-law. McElyea stated she was capable of performing her own personal hygiene duties and helping with all the caregiving needs for her children (e.g., laundry, meals, clothes, shopping). These demands were challenging and there were days when "I'd rather just stay in bed because I get so overwhelmed by everything that needs to be done." (Tr. 61).

McElyea was taking prescription medication for her stomach and for asthma and allergies and was not taking mental health medication. The stomach medication provided very little relief. There were days when she forgot to take her medicine.

As a "homebody," social outings were rare, and she was not involved in church, club, or group activities outside the home. (Tr. 62).

When questioned by her attorney, McElyea elaborated that she mentally would "bottom out . . . go to a very dark place . . . start feeling like everybody would just be better off without me here." *Id.* She also described getting angry during these times, resulting in verbal confrontations. These events occurred every time she left her home. Her issues with feeling overwhelmed caused friction with her family members, according to McElyea. Family members encouraged her to slow down and breathe but she found this very hard and she was "freaking out" and "in fight or flight mode constantly." 64).

McElyea described physical problems, including bilateral carpal tunnel syndrome in both hands with radiating pain into her arms, resulting in difficulty holding items. According to McElyea, her back would lock up when she must bend and pick up items. She estimated she could stand for 10-15 minutes before needing to sit for at least 30 minutes to recuperate. Sitting in one position for more than five minutes was also difficult, causing back pain and lower extremity numbness.

Myrtle Johnson ("Johnson"), a vocational expert, testified. The ALJ asked Johnson to consider a hypothetical worker of McElyea's age, education, and experience, who could work at a medium exertional level with the following restrictions: can understand, remember, and carryout simple, but not complex, instructions; could not have more than occasional interaction with supervisors while performing work duties; and could not have more than occasional interaction with the general public while performing work duties. Johnson testified that such a hypothetical worker could not perform McElyea's past relevant work as a CNA but could perform the jobs of fruit picker, counter supply worker, and bagger/cart attendant. Johnson stated that all these jobs did not require a reasoning level above 2.

The ALJ posed a second hypothetical question to Johnson, adding the following restriction to those included in the first question: the worker would not be able to perform their duties more than six hours in a workday. Such a worker, according to Johnson, would not be able to perform any jobs.

If the hypothetical question included no interaction whatsoever with supervisors, the general public, and co-workers, no jobs would be available to such a worker. (Tr. 67-70).

*The ALJ's Decision:*

In his May 22, 2024 decision, the ALJ determined McElyea had the following severe impairments: major depressive disorder, panic disorder, generalized anxiety disorder, borderline personality disorder, lumbar facet arthropathy, and cervical spondylosis. The ALJ found non-severe medically determinable impairments of bilateral carpal tunnel syndrome, obesity, asthma, irritable bowel syndrome, and chronic esophagitis with gastroesophageal reflux disease. The ALJ acknowledged McElyea's allegations of additional impairments (memory loss, sleep apnea, heart arrhythmia, nausea, and migraines) but found they were not medically determinable.

The ALJ found McElyea did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1. The ALJ specifically addressed Listing 1.15 (disorders of the spine) and Listings 12.04, 12.06, 12.08, and 12.15 (mental impairments). As part of this analysis, the ALJ considered the "paragraph B" criteria, rating McElyea in four broad areas of functioning, finding: (1) a mild limitation in understanding, remembering or applying information; (2) a moderate limitation in interacting with others; (3) a moderate limitation in concentrating, persisting or maintaining pace; and (4) a mild limitation in adapting or managing oneself. Since McElyea was not markedly limited in two of these areas, or extremely limited in one area, the "paragraph B" criteria were not satisfied.

The ALJ also found the "paragraph C" criteria was not satisfied because the record did not establish that McElyea had only marginal adjustment or a minimal capacity to adapt to changes in her environment or to demands that were not already part of her daily life.

The ALJ determined McElyea had the RFC to perform medium work with the following limitations: can understand, remember, and carry out simple but not complex instructions; can have not more than occasional interactions with supervisors and not more than occasional interactions with the general public while performing work duties. This RFC assessment mirrored the parameters in the first hypothetical question posed to Johnson.

The ALJ opined that McElyea's medically determinable impairments could reasonably be expected to cause her alleged symptoms. However, the ALJ found McElyea's statements about the intensity, persistence and limiting effects of the symptoms were "not entirely consistent with the medical evidence and other evidence in the record." (Tr. 34).

The ALJ thoroughly reviewed the testimony of McElyea and the medical evidence, beginning with her visit to a neurosurgery clinic in April 2021 for neck and lower back pain. She was seen for a variety of physical issues between April

2021 and August 2022.[1]

Of particular relevance in this case, McElyea was in mental health therapy until November 2020 but did not continue this treatment until February 2022, when she was seen by Alexandra Smith, LCSW ("Smith"). Smith observed McElyea was oriented x 4, well-groomed, with average demeanor and eye contact, clear speech, moderate judgment and insight, cooperative, with pleasant mood and congruent affect. "She presents with linear thoughts and is easily able to engage throughout the session. She does at times derail and requires some prompts to remain on topic." (Tr. 902). In her summary, Smith noted McElyea's reports of many issues, including loss of temper, arguing, sometimes blaming others, and sometimes being spiteful, with verbal aggression, and "really bad anxiety, excessive worry, restlessness . . . panic attacks daily." (Tr. 904). Smith diagnosed McElyea with generalized anxiety disorder, major depressive disorder (recurrent episode, moderate), and borderline personality disorder. Smith outlined short-and long-term goals and reported McElyea's agreement with the recommendations. The prognosis was good, according to Smith.[2] (Tr. 898-905).

---

[1] McElyea was seen a total of eleven times from April 2021 through August 2022, including physical therapy visits, three visits to her primary care physician, an emergency room visit, and a visit to Heart Hospital with related follow up care with the cardiology clinic.

[2] McElyea returned to Smith for sixteen visits between February and July 2022. (Tr. 849-897). Smith rated her prognosis as good and found slight progress at fourteen of the

The ALJ also addressed Hester's report:

> On May 1, 2023, the psychological consultative examiner, Samuel Hester, Ph.D., opined that the claimant was unable to complete the mental demands of basic work tasks and the claimant had a limited ability to attend and sustain concentration on basic tasks. He adds that the claimant has a limited capacity to communicate and interact in a socially adequate manner and that the claimant has the capacity to communicate in an intelligible but not always effective manner. On the other hand, Dr. Hester also states that the claimant can sustain persistence in completing tasks and can complete work in an acceptable time frame. His opinion is supported by his examination of the claimant's inability to recall two objects after a five-minute delay and was slowly able to perform serial 3's using her fingers. Further, it is supported by the claimant's diagnosis of generalized anxiety disorder, panic disorder, borderline personality disorder and major depressive disorder. The undersigned is partially persuaded by the opinion of Dr. Hester, however his opinion that the claimant cannot complete the mental demands of basic work tasks is inconsistent with the longitudinal record which shows that she has not been in mental counseling since July 2022 and has not been prescribed any treatment for her mental health. Furthermore, it is inconsistent with the claimant's ability to take care of her three children independently, cook, shop, drive and pay her bills.

(Tr. 37).

The ALJ also considered the findings of the state agency consultants. Rachel Morrisey, Ph.D., ("Morrisey"), opined at the initial level that McElyea had the mental ability to do basic work activities where the work involved routine but superficial interpersonal contact, the complexity of the tasks was learned by experience, and the supervision was little for routine tasks but detailed for non-

---

visits. At the July 5 and July 12 visits no progress was noted and the prognosis was minimal. (Tr. 849-853, 857-859).

routine duties. At the reconsideration level, Kristin Addison-Brown, Ph.D., ("Addison-Brown") found McElyea could perform work where interpersonal contact was incidental to work performed, complexity of tasks was learned and performed by rote, with few variables, little judgment, and required supervision was simple, direct, and concrete. The ALJ found the reports of Morrisey and Addison-Brown persuasive.

The ALJ determined McElyea could not perform her past relevant work. Relying upon Johnson's expert testimony, the ALJ concluded that there were jobs which McElyea could perform, and she was not disabled. (Tr. 27-41).

*Claim One – ALJ failed to properly evaluate Hester's opinion.*

The relevant regulations require the ALJ to assess the persuasiveness of Hester's medical opinion. At a minimum, the ALJ must address each opinion's supportability and consistency. 20 C.F.R. § 416.920c(a), (c). Supportability is whether the opinion is supported by objective medical evidence and by the source's own explanation of the opinion. Consistency is whether the opinion is consistent with the other medical evidence in the record. 20 C.F.R. § 416.920c(c). As quoted above, the ALJ concluded that Hester's opinion was partially persuasive.

McElyea faults the ALJ for drawing a negative inference from her lack of mental health treatment without first considering her explanations. She contends the

ALJ should have taken into account her complaints that medication for her mental health had not worked in the past, had caused side effects, and transportation and insurance issues precluded her from receiving mental health care. The records reflect McElyea sought medications "that will help her instead of zombiefying her." (Tr. 411). However, this occurred in November 2020, prior to the alleged onset date of February 1, 2021. She again complained of medication which "zombiefied" her and trapped her in her own thoughts on March 11, 2021. This complaint was made at the time she was terminated as a psychiatric patient due to "discontinued contact." (Tr. 419). In July of 2021, McElyea was seen by her primary care physician complaining of weight gain. At this visit she reported that she had no success in earlier efforts to lose weight by taking antidepressants, walking, drinking water, etc. (Tr. 666). In October of 2021, she was seen at Pain Treatment Centers of America for neck and lower back pain. At this visit the provider strongly recommended she return to mental health counseling "as chronic pain and mental health go hand in hand." (Tr. 774). There was discussion of ineffective medications tried in the past but these medications (gabapentin, hydrocodone, oxycodone) appear to have targeted her pain ("her pain meds make her too groggy") and not her mental impairments. *Id.* In an April 2022 return visit to her primary care physician, McElyea reported she had been on multiple antidepressant medications in the past "and had no benefits." (Tr. 835).

The ALJ did not err by failing to first consider McElyea's explanations for not seeking mental health treatment. The few instances in the medical records cited by McElyea were not always tied to mental health treatment. For example, her mention of side effects or ineffectiveness was in the context of pain management and weight concerns, and these comments were not made to mental health care providers. These sporadic comments do not establish a compelling reason why she neglected to seek mental health care. And these minimal instances are outweighed by her own testimony that she chose not to seek mental health care in order to be available to her children. When questioned about mental health medication at the hearing, McElyea conceded she was not currently taking any. There was no mention of side effects or ineffectiveness as the underlying reason for avoiding the medications. (Tr. 57-58).

McElyea also disputes the ALJ's consideration of her daily activities. The ALJ cited McElyea's ability to prepare simple meals, go out independently, drive, shop, handle finances and take care of her three children, as evidence supporting his assessment of her subjective statements. McElyea describes these daily activities as "minimal" and not necessarily disproving her symptoms. Doc. No. 9, page 19. She cites *Burnside v. Apfel*, 223 F.3d 840, 845 (8th Cir. 2000) and *Tang v. Apfel*, 205 F.3d 1084,1086 (8th Cir. 2000) as supporting cases. These cases, however, are not persuasive. In *Burnside,* the Court noted that a claimant need not be bedridden to

demonstrate disability, and that cooking, cleaning, and doing hobbies does not necessarily demonstrate an ability to perform gainful activity. In *Tang,* the claimant got his children ready for school and did laundry but otherwise was very limited, unable to take out the garbage or mow the lawn. Those activities were "scant evidence" of the claimant's ability to perform gainful employment. 205 F.3d at 1086.

The daily activities performed by McElyea are significantly greater than those described in *Burnside* and *Tang*. When questioned about doing laundry, preparing meals, dressing her three children, and seeing to their needs, McElyea stated, "I do all of it." (Tr. 60). She also drove, made the financial decisions, and shopped. These activities are also different from those described *Burnside* and *Tang*. Instead, the activities are very similar to those cited by the Court in *Thomas v. Berryhill*, 881 F.3d 672, 676 (8th Cir. 2018): "Thomas's activities—caring for her young son, preparing his meals, doing housework, shopping for groceries, handling money, watching television, and driving a car when necessary, among other things—showed that she could work." 881 F.3d at 676. *See also McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011) (claimant's ability to garden, drive, and help his children prepare for school "are inconsistent with subjective complaints of disabling pain."). The ALJ did not err in considering McElyea's daily activities.

The ALJ satisfied the requirements of the regulations when analyzing Hester's opinion.

*Claim Two – the ALJ's RFC was erroneous because he failed to fully incorporate mental work-related interpersonal contact limitations assessed by the state agency psychologists and deemed persuasive by the ALJ.*

State agency consultants Morrisey and Addison-Brown both found McElyea moderately limited in her interpersonal ability in a work setting. As previously noted, Morrisey limited McElyea to work where interpersonal contact was routine but superficial, while Addison-Brown would limit her to work where interpersonal contact is incidental to the work performed. (Tr. 86, 108). The ALJ determined McElyea was capable of medium work but could not have more than occasional interaction with supervisors or with the general public while performing work duties. McElyea construes the limitations of the state experts as more severe than those imposed by the ALJ and urges remand to reconcile this discrepancy.

Generally, the RFC need not mirror the findings of any one physician, as the ALJ is not bound to choose any one physician and adopt his/her findings as the appropriate RFC. Instead, it "is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his limitations."

*Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001).

Here, the ALJ found the opinions of Morrisey and Addison-Brown persuasive. It does not follow that the ALJ was obligated to adopt their findings verbatim. "The ALJ is not required to adopt verbatim the findings of doctors that he determines to be persuasive, so long as substantial evidence in the record as a whole supports his decision. *See McKinney v. O'Malley*, No. 23-3220, 2024 WL 1327965 (8th Cir. Mar. 28, 2024); *Lane v. O'Malley, No. 23-1432*, 2024 WL 302395 (8th Cir. Jan. 26, 2024)." *Norris v. Bisignano*, No. 4:25-CV-00511-DPM-JJV, 2025 WL 3216317, at *4 (E.D. Ark. Nov. 18, 2025), *report and recommendation adopted sub nom. Norris v. Soc. Sec. Admin., Comm'r*, No. 4:25-CV-511-DPM, 2025 WL 3532617 (E.D. Ark. Dec. 9, 2025). The state experts found moderate limitations on McElyea's interpersonal dealings; the ALJ agreed, in large part, imposing interpersonal limitations. Despite McElyea's view of the gap between the experts' opinions and the ALJ's RFC, the difference is not so great. And the ALJ adequately explained why he imposed the limitations that he chose. *See also Lane v. O'Malley*, 2024 WL 302395 (8th Cir. Jan. 26, 2024) (affirming RFC determination where ALJ limited claimant to "occasional" interaction and state experts found claimant capable of "superficial" interaction).

In summary, substantial evidence supports the determinations reached by the ALJ. The Court is mindful that its task is not to review the record and arrive at an

independent decision, nor is it to reverse if some evidence supports a different conclusion. The test is whether substantial evidence supports the ALJ's decision. *See, e.g., Byes v. Astrue*, 687 F.3d 913, 915 (8th Cir. 2012). This test is amply satisfied in this case.

Therefore, it is recommended that the final decision of Bisignano be affirmed and McElyea's complaint be dismissed with prejudice.

IT IS SO ORDERED this 21st day of September, 2026.

UNITED STATES MAGISTRATE JUDGE